**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CLARA LYNCKER,

                Plaintiff,

vs.                                    Case No. 3:05-cv-765-J-32TEM

JOHNSON & JOHNSON
PENSION COMMITTEE,

                Defendant.

_____

## ORDER

      This ERISA case is before the Court on cross dispositive motions. Plaintiff,

Clara Lyncker ("Lyncker"), filed a Motion for Summary Judgment (Doc. 17), and,

defendant, Johnson & Johnson Pension Committee ("defendant"), filed a Motion for

Final Judgment Based on Review of Administrative Record (Doc. 12).   Plaintiff

responded in opposition to defendant's motion (Doc. 18); defendant did not respond

to plaintiff's motion.  On September 6, 2006, the Court held oral argument.  (Doc. 20).

**I.**    **BACKGROUND**

    **A.**    **The Parties and the Plan**

      Plaintiff is a fifty-two year old female, who was formerly employed with Johnson

& Johnson as an account representative, a sedentary position.  Prior to working as

an account representative, Lyncker worked as an administrative coordinator

1

supporting the financial division, also a sedentary position.  Lyncker, a twelve year employee at Johnson & Johnson, stopped working on June 15, 2001.  In this suit, Lyncker seeks payment of long term disability benefits under Johnson & Johnson's Long Term Disability Plan.

Johnson & Johnson's Long Term Disability Plan grants discretion to the Johnson & Johnson Pension Committee to administer the Plan and determine entitlement to benefits.  (Doc. 14-2, Plan - J&J 0121).  The Committee, in turn, is empowered to delegate its administrative function to a "Claims Service Organization" (CSO).  (Id. at 0122).  The Committee delegated its authority to Broadspire, which administered plaintiff's claim.  The Plan is funded by contributions from the Johnson & Johnson Voluntary Employee Benefit Trust.  (Id. at 0124).  Thus, while Broadspire administered the claim, any benefits are paid out of the Trust.

For periods of disability beginning on or after January 1, 2001, but prior to July 1, 2004, the term "Total Disability" means:

(a)     during the Elimination Period, the complete inability of the Participant, due to Sickness or Injury, to perform the material and substantial duties of the Participant's regular job, with or without reasonable accommodation, AND

(b)     during the portion of any period of disability not exceeding 24 months following the duration of the Elimination Period, the complete inability of the Participant, due to Sickness or Injury, to perform the Essential Functions of his or her Regular Occupation or of a Reasonable Employment Option available to the participant, and as a result the inability to earn more than 60% of pre-disability Regular Monthly Earnings with or without reasonable accommodation, AND

(c)     during the remainder, if any, of the period of disability, the complete inability of the Participant, due to Sickness or Injury, to perform the Essential Functions of any Gainful Occupation that his or her training, education and experience would allow the Participant to perform, or for which the Participant may reasonably become qualified, with or without reasonable accommodation.

(Id. at 0104-0105).   The Elimination Period (the period during which short term disability benefits are payable) is "a period of continuous total disability due to Sickness or Injury that extends 26 weeks."  (Id. at 0101).

Article IV of the Plan ("Benefits Eligibility") contains a subsection titled "Evaluation of Participant's Medical Status," which provides, in pertinent part:

The Plan Administrator and its authorized representatives...shall have the right to conduct evaluations of a Participant's medical status and eligibility for benefits under the Plan at any time while an application for benefits is pending, a Participant is receiving benefits or a claim or claim appeal is pending.  It is the Participant's responsibility to provide the Claims Service Organization with all information necessary to evaluate his or her medical condition and functional capacity, including but not limited to information supplied by the Treating provider.

(Id. at 0112).

Lyncker ceased work on June 15, 2001 due to a host of maladies, including severe asthma and allergies, bronchitis and sinusitis, and received short term disability benefits during the twenty-six week Elimination Period (June 15, 2001 through December 14, 2001) and long term disability benefits thereafter until April 22, 2004.  (Doc. 14-1, Lyncker 0106-0108, 0067-0070).[1]  The Plan paid Lyncker LTD

---

[1]     The parties filed the administrative record (which contains Lyncker's medical records) in this case under seal.  However, to rule on the cross motions, the Court

benefits during the entirety of the "Own Occupation" period and into the beginning of the "Any Occupation" period.  (Id. at Lyncker 0107).

## B.   Background Facts

### 1.   Medical History from January 2001 through February 2004

On November 7, 2001, pulmonologist Bruce Yergin, M.D., prepared a Physician Report stating that he initially treated Lyncker on September 12, 2001 for bronchial asthma.  (Id. at Lyncker 0028).  Dr. Yergin's objective finding was that Lyncker had "severe diffuse bilateral expiratory wheezing."  (Id.).  Dr. Yergin determined that Lyncker could not return to work, even with restrictions, due to her activity-induced bronchospasms, chest pain and extreme fatigue.  (Id.).  On November 19, 2001, Dr. Yergin prepared a "Return to Work Release" stating that Lyncker could return to full duty on December 14, 2001, but noted that Lyncker had to avoid any activity that would induce her bronchospasms.  (Id. at Lyncker 0030).

On April 15, 2002, cardiologist Paul Dillahunt, M.D., evaluated Lyncker and diagnosed her with chronic inappropriate tachycardia (abnormally high resting heart rate - which rapidly increases due to minimal exertion) and dyspnea (shortness of breath) potentially due to cardiomyopathy or valvular heart disease.  (Id. at Lyncker 0033-0034).  An echocardiogram dated April 22, 2002 confirmed a mitral valve prolapse.  (Id. at Lyncker 0035).

_____

must discuss portions of the administrative record.  Thus, any references to "Doc. 14-1, Lyncker ___" relate to the sealed administrative record documents.

On September 20, 2002, Lyncker prepared an "LTD Questionnaire" and essentially reported that because of her asthma she could not go out in public, and that doing so resulted in an upper respiratory infection and increased medication. (Id. at Lyncker 0049). On June 6, 2003, Lyncker prepared a questionnaire and responded that she (1) could not perform her own occupation or any gainful employment because she takes multiple medications daily that make her drowsy, sleepy and dizzy (making it dangerous for her to drive to and from work), (2) experiences pain in her breastbone, neck and rib cage from coughing, (3) has pain in her knees and ankles, (4) feels depressed because of her inability to work or socialize and (5) wears a face mask in an effort to avoid any triggering of her asthma and sinus problems when she goes outside. (Id. at Lyncker 0064, 0068-0070).

On July 7, 2003, Lyncker's treating physician, Dr. Sudhir L. Prabhu, M.D., prepared a "Physician's Report of Physical Capacity." (Id. at Lyncker 0076-0078). Dr. Prabhu noted Lyncker's overall condition as "unchanged to retrogressed" and opined that she was severely limited in her functional capacity and was incapable of sedentary work. (Id.).

On October 27, 2003, Lyncker visited rheumatologist James Popp, M.D., stating she had pain in her knees and right ankle and intermittent problems with her elbows, wrist, sternum, neck and back and that she experienced fatigue and difficulty sleeping. (Id. at Lyncker 0081). On October 31, 2003, Lyncker had an X-ray of both

knees, which showed "prominent" degenerative conditions in each.  (Id. at Lyncker 0085).

On January 29, 2004, Broadspire requested that pulmonologist Edward Klotz, M.D., have a peer to peer meeting with Dr. Prabhu to determine whether Lyncker was permanently and totally disabled from performing any occupation.  (Id. at Lyncker 0089).  The "General Peer Review" form notes that Dr. Klotz reviewed Lyncker's "progress notes." (Id.).  Dr. Klotz concluded that Lyncker failed to support a functional impairment that precluded her from working "through the entire time period."  (Id.). Dr. Klotz's rationale for his decision was primarily based on one telephone discussion with Dr. Prabhu, during which Dr. Prabhu purportedly told him, that while Lyncker experienced several exacerbations of her symptoms (occurring every two to three months), they did not require hospitalization and could be treated with increased levels of Prednisone. (Id. at Lyncker 0090).  Dr. Klotz also noted that Dr. Prabhu told him that Lyncker was able to walk without significant difficulty and that she was able to work in a sedentary position, but restrictions were that the workplace had to be "dust and fume free (including perfume) and not have extremes of temperature." (Id.).

On February 10, 2004, psychiatrist Eduardo A. Sanchez, M.D, prepared a "Behavioral Health Clinician Statement" assessing Lyncker's cognitive functioning. Dr. Sanchez noted that Lyncker had no abnormality in her affect during the exam, her reasoning and judgment were within normal limits, there were no findings of

socialization problems, and, from a cognitive perspective, she was able to work full duty.  (Id. at Lyncker 0091-0092).

On February 19, 2004, at Broadspire's direction, vocational field manager Robert Ciervo performed an Employability Assessment Report.  (Id. at Lyncker 0101-0105).  The assessment begins with the premise that Dr. Prabhu and Dr. Klotz agree that Lyncker is capable of returning to sedentary work with the previously mentioned restrictions.  (Id. at Lyncker 0102).  Mr. Ciervo classified Lyncker's position as sedentary and identified three jobs for which Lyncker was qualified.  (Id. at Lyncker 0104-0105).

On February 24, 2004, physical medicine physician Shahriar A. Nabizadeh, M.D., examined Lyncker.  Dr. Nabizadeh noted Lyncker's medical history of asthma, pain in her knees and ankles and depression related to her various maladies.  (Id. at Lyncker 0256-0257).  Dr. Nabizadeh diagnosed plaintiff with severe degenerative joint diseases in both knees, decreased gait and myofascial pain.  (Id.).

### 2. March 2004 Denial of Benefits and Subsequent History

On March 4, 2004, Broadspire issued a letter to Lyncker terminating long term disability benefits effective April 22, 2004 (which was after the conclusion of the "Own Occupation" period and in the beginning of the "Any Occupation" period).  (Id. at Lyncker 0106-0108).  Broadspire listed the physicians that plaintiff had seen and stated, in pertinent part, "[t]he progress notes received from your treating physicians

did not show what your functional disabilities are that would prevent you from working in any occupation." (Id. at Lyncker 0107).   Broadspire also noted that its peer reviewer, Dr. Klotz, reviewed medical documentation from Dr. Prabhu and discussed Lyncker's condition with Dr. Prabhu, who opined that Lyncker was capable of working in a sedentary capacity. (Id.).  Broadspire determined to discontinue Lyncker's LTD benefits; Broadspire informed Lyncker of her right to appeal, and if that appeal was denied, to file suit under ERISA. (Id. at Lyncker 0108).  On April 19, 2004, Lyncker, via her counsel, appealed Broadspire's determination to discontinue benefits. (Id. at Lyncker 0110).

On March 29, 2004, in response to the discontinuation of benefits, Dr. Prabhu authored a letter concerning Lyncker's status.  (Id. at Lyncker 0137-0138).  Dr. Prabhu sets forth in the letter his twenty year history of treating Lyncker and states that in 2001 her asthma relapsed progressively causing her to become steroid dependent. (Id.).  Dr. Prabhu noted that Lyncker's "ongoing repiratory difficulty has significantly compromised her ability to carry out routine household chores, be outdoors for any length of time, go to the theatre, the mall or be with a group of people or hold gainful employment." (Id.).  Dr. Prabhu concluded that:

> [I]t is my professional opinion that Mrs. Lyncker suffers from severe recalcitrant steroid dependent (only partially responsive) chronic perennial progressive asthma.  She has a persistent smoldering type of asthma in that we have been able to keep her out of the emergency room and hospitals due to intensive therapy, an open communication line with the office and pulse therapy with Prednisone.  However despite

8

> maximal and aggressive management plan, she continues to have frequent flare ups, superimposed upon her baseline respiratory difficulty, characterized by asthmatic bronchitis type symptoms.  It is my opinion that her respiratory impairment as well as significant sensitivity to irritants such as perfumes, colognes, second hand smoke, cleaning agents, wind draft, cold air as well as exertion and her frequency of exacerbations of asthma as a result of respiratory infection...it is not possible for Mrs. Lyncker to hold regular gainful employment at this time.

(Id. at 0138).

Further, on April 28, 2004, Dr. Prabhu prepared a "Treating Physician's Medical Assessment of Ability to do Work-Related Activities."  (Id. at Lyncker 0200-0204).  Dr. Prabhu noted that (1) Lyncker was limited to carrying less than five to ten pounds due to "compromised lung function" and "chronic, severe, ongoing asthma," (2) it cannot be predicted as to how many hours in an eight hour work day that Lyncker can stand and walk because it depends on the severity of her exacerbation on a particular day, (3) Lyncker's ability to sit is unimpaired, (4) Lyncker requires rest periods during the day and (5) temperature extremes, chemicals, dust, fumes and humidity exacerbate her asthma.  (Id. at Lyncker 0200-0204).

On October 27, 2004, the Social Security Administration ("SSA") adjudicated Lyncker totally disabled.  (Id. at Lyncker 0264-0272).  After recapitulating Lyncker's medical history, the Administrative Law Judge ("ALJ") stated that the "written evidence supports a finding that the claimant retains the residual functional capacity to perform

less than a full range of sedentary exertional level work."[2]  (Id. at Lyncker 0267).

Ultimately, the ALJ found (1) the medical evidence establishes that the claimant has

the severe impairments of asthma and affective disorder, (2) Lyncker's assertions

concerning her ability to work were credible and (3) Lyncker is unable to perform the

requirements of her past relevant work.  (Id. at Lyncker 0268-0269).

On November 22, 2004, Dr. Robert J. Kleinhaus performed a left knee

replacement on Lyncker due to her severe osteoarthritis.  (Id. at Lyncker 0353).  From

December 20, 2004 through February 17, 2005, Lyncker underwent physical therapy

with Heartland Rehabilitation Services for the left knee; when Lyncker was discharged

from physical therapy, she had met all or most of her goals from the initial evaluation.

(Id. at Lyncker 0357).

In January and February 2005, Broadspire hired three peer reviewers to assess

Lyncker's medical records: Dr. Lucy Cohen (Physiatry/Pain Management), Dr.

Laurence Burnstein (Psychology) and Dr. Wendy Weinstein (Internal Medicine).  On

January 28, 2005, Dr. Weinstein reviewed Lyncker's medical records submitted and

stated that while Lyncker had a history of difficult to control asthma, there was "no

documentation of recent exacerbations or impaired functionality that would preclude

her from working."  (Id. at Lyncker 0389).

---

[2]   The decision defines "less than a sedentary exertional level of work" as the inability to lift and carry ten pounds or sit six hours out of an eight-hour workday.  (Id. at Lyncker 0267).

On February 1, 2005, Dr. Cohen performed a review of Lyncker's medical records from a physiatry perspective and opined that based on the documentation and the functional evaluations performed, there was insufficient clinical data to preclude her from performing a sedentary job from April 23, 2004 onward. Dr. Cohen noted that Lyncker did not have a significant loss of range of motion in her upper extremities and that there was no indication of any muscle strength deficit. (Id. at Lyncker 0381).

On February 2, 2005, Dr. Burnstein performed a peer records review from a psychological perspective and found that there was no impairment existing after April 23, 2004 precluding Lyncker from performing any occupation. (Id. at Lyncker 0385). Dr. Burnstein notes that the medical records only occasionally refer to the claimant being depressed and that those infrequent references primarily indicate that the claimant had a depressed mood; further, there are no notes or examination findings documenting cognitive, behavioral or emotional dysfunction, which would indicate an inability to function from a psychological perspective. (Id.). Dr. Burnstein discussed Dr. Sanchez's findings and notes and stated that in regard to Lyncker's emotional functioning, Dr. Sanchez found "no abnormality." (Id.). Finally, Dr. Burnstein noted that Dr. Sanchez rated Lyncker's impairment as a class 1, which means that she has no impairment and is able to function under stress and engage in interpersonal relationships. (Id.).

11

### 3.   Appeal Denial and Subsequent Appeal

On January 28, 2005, Broadspire issued an appeal denial letter to Lyncker.  (Id. at Lyncker 0390-0393).  The appeal denial letter notes that while Lyncker had a history of difficult to control asthma, "there is no clinical documentation of recent exacerbations or impaired functionality that would preclude her from working.  There is no documentation of frequent incapacitating asthma episodes requiring emergency room visits or hospitalization for respiratory distress or hypoxemia."  (Id. at Lyncker 0392).  The letter also referenced Lyncker's past heart problems and depression. (Id.).  Ultimately, Broadspire concluded that there was insufficient medical evidence to support a physical or psychological impairment precluding Lyncker from performing "any job as of 4/23/04." (Id.).  Broadspire further informed Lyncker that she could seek reconsideration of the denial; on February 10, 2005, Lyncker did so.  (Id. at Lyncker 0393, 0274).

On March 2, 2005, psychologist Jeanne D. Montross evaluated Lyncker and noted that she was "not depressed" and that she "denies any symptoms." (Id. at Lyncker 0311).  Dr. Montross also noted that Lyncker's intellect and memory were good and that her affect was appropriate and congruent. (Id.).

On March 30, 2005, Dr. Prabhu authored a letter to Lyncker's counsel, which was submitted to Broadspire, stating Broadspire's January 29, 2004 Peer Review performed by Dr. Edward Klotz did not accurately convey Prabhu's professional

opinion concerning Lyncker.  (Id. at Lyncker 0330).  Dr. Prabhu wrote, "I maintain that it is not possible for Mrs. Lyncker to hold gainful employment at this time, as I stated in my narrative dated 3/29/04."  (Id.).  After receiving this letter from Dr. Prabhu, Broadspire and the Pension Committee did not contact Dr. Prabhu nor did they perform any additional review (records or otherwise) of Lyncker.

On July 11, 2005, the Johnson & Johnson Review Committee issued the final denial of Lyncker's claim stating, as before, that "[there was] [n]o documentation of frequent or incapacitating exacerbations of asthma attacks which required emergency care and/or hospitalizations."  (Id. at Lyncker 0006).  The final denial letter also states that Dr. Prabhu described in his Medical Assessment of Ability to Work that Lyncker had a sedentary capability.  (Id.).  The letter describes Lyncker's heart ailments as well controlled, that her left knee had been successfully replaced and that there was no documentation of a severe emotional problem.  (Id.).

## II.   DISCUSSION

### A.   Summary Judgment Standard

"In an ERISA benefit denial case...in a very real sense, the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  Curran v. Kemper Nat. Servs., Inc., 2005 WL 894840, *7 (11th Cir. 2005) (unpublished per curiam opinion) (quoting Leahy v.

Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002)); accord Smith v. Home Depot Welfare Benefits Plan, 2006 WL 1980284, *4 (M.D. Fla. July 12, 2006) (unpublished opinion). "Where the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." Crume v. Met. Life Ins. Co., 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006) (quoting Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999)).

In essence, the Eleventh Circuit's discussion in the unpublished Curran[3] decision augments the traditional summary judgment rules as applied to review of ERISA benefit denial cases such as this, yet still decides the case under Fed. R. Civ. P. 56. As Judge Conway so aptly discussed in Crume:

> [W]here the ultimate issue to be determined is whether there is a reasonable basis for a claims administrator's benefits decision, it is difficult to ascertain how the 'normal' summary judgment rules can sensibly apply. After all, the pertinent question is not whether the claimant is truly disabled, but whether there is a reasonable basis in the record to support the administrator's decision on that point. In other words, conflicting evidence on the question of disability cannot alone create an issue of fact precluding summary judgment, since an administrator's decision that rejects certain evidence and credits conflicting proof may nevertheless be reasonable.

417 F. Supp. 2d at 1273.

---

[3]   While it is true that the Eleventh Circuit's unpublished opinions are not binding authority and that reliance upon them alone is ordinarily disfavored, they are nevertheless persuasive. See 11th Cir. R. 36-2 and I.O.P. 6.

**B.    Applicable ERISA Standards**

Under ERISA, the plaintiff "has the burden of showing that [s]he is entitled to the 'benefits under the terms of [the] plan.'" Stvartak v. Eastman Kodak Co., 945 F. Supp. 1532, 1536 (M.D. Fla. 1996) (quoting 29 U.S.C. § 1132(a)) aff'd, 144 F.3d 54 (11th Cir. 1998); Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998).  ERISA provides no standard for reviewing decisions of plan administrators or plan fiduciaries.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989). After Firestone, the Eleventh Circuit adopted three separate standards for reviewing administrators' plan decisions: "(1) *de novo* where the plan does not grant the administrator discretion [i.e., the administrator does not exercise discretion in deciding claims]; (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] ... [he has] ... a conflict of interest." Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1134-35 (11th Cir. 2004) (quoting HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001) (citation omitted)).

In Williams, the Eleventh Circuit recapitulated the applicable framework for analyzing "virtually all" ERISA plan benefit denials:

1.    Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

15

2.    If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

3.    If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

4.    If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

5.    If there is no conflict, then end the inquiry and affirm the decision.

6.    If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Id. at 1137-38.

Based on the "virtually all" language in Williams, it appears that the six step analysis applies in every ERISA long term disability benefits denial case.  Id. at 1137-38.  The Williams court even footnoted this language and stated that "[w]e thus mean both benefits denials based on plan interpretations as well [as] on factual determinations, since many, if not most determinations will involve 'issues of both plan interpretation and fact,' ... and we will otherwise wait to be confronted by principled exception to say otherwise here."  Id. at 1137 n. 6.  Thus, the Eleventh Circuit appears to mean for the six step framework to apply to *all* ERISA cases, regardless of whether the administrator is vested with discretionary authority to determine eligibility for benefits or if there is a conflict of interest.  In fact, the Eleventh Circuit so stated in one

16

recent post <u>Williams</u> opinion.  <u>See</u> <u>Tippitt v. Reliance Standard Life Ins. Co.</u>, 457 F.3d 1227, 1232 (11th Cir. 2006) ("regardless of whether arbitrary and capricious review or the heightened form of that standard of review applies, the court reviews de novo the claims administrator's interpretation of the plan to determine whether it is 'wrong'") (citation omitted).

There is no dispute in this case that if the Court must travel beyond the "de novo" analysis in steps 1 and 2 of <u>Williams</u>, the arbitrary and capricious standard must ultimately be applied as it is clear that while the Pension Committee is vested with discretion to either make benefit determination decisions or to pass that discretion to a CSO (Broadspire here), it does not pay benefits from its own assets, thus avoiding any conflict of interest.

"Under the arbitrary and capricious standard of review (sometimes used interchangeably with an abuse of discretion standard), the court seeks 'to determine whether there was a reasonable basis for the [administrator's] decision, based upon the facts as known to the administrator at the time the decision was made.'" <u>Hunt v. Hawthorne Assoc., Inc.</u>, 119 F.3d 888, 912 (11th Cir. 1997) (quoting <u>Jett v. Blue Cross and Blue Shield of Ala., Inc.</u>, 890 F.2d 1137, 1139 (11th Cir. 1989)).  "Normally, '[a] decision to deny benefits is arbitrary and capricious if no reasonable basis exists for the decision.'" <u>Levinson v. Reliance Standard Life Ins. Co.</u>, 245 F.3d 1321, 1325-26 (11th Cir. 2001) (citation omitted).  Under this standard, a "wrong" but reasonable

17

determination may not be overturned, but a "wrong" and unreasonable decision is subject to reversal.  HCA Health Servs. Of Ga., Inc., 240 F.3d at 994; Dibiccari v. Lockheed Martin Retirement Plan, 244 F. Supp. 2d 1308, 1312-13 (M.D. Fla. 2002). While the arbitrary and capricious standard is the least demanding form of judicial review of administrative action, it is not, however, "without teeth."  McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 169, 172 (6th Cir. 2003).   Merely because this Court's review is deferential, that does not mean that federal courts "sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." Evans v. Unumprovident Corp., 434 F.3d 866, 876 (6th Cir. 2006) (citation omitted).

### C.    Continued LTD Benefits Entitlement

Broadspire was "not wrong" to determine that Lyncker is not totally disabled based on her heart ailments (tachycardia and mitral valve prolapse), depression or lower extremity physical ailments (knee and ankle problems).  Lyncker's heart ailments are controlled by medication, Drs. Sanchez, Burnstein and Montross agreed that Lyncker was not depressed (there is no documentation in the record to the contrary) and the records suggest that Lyncker's ailments in her lower extremities significantly improved after the November 22, 2004 left knee replacement and her subsequent physical therapy.

However, with respect to Lyncker's asthmatic and pulmonary conditions,

Broadspire was not only "wrong" to deny continued LTD benefits into the "Any Occupation" period, but also arbitrary and capricious. The threshold issue concerning the reasonableness of the administrator's decision is the discrepancy between Dr. Klotz's version of his January 29, 2004 conversation with Dr. Prabhu, and Dr. Prabhu's rendition thereof. Dr. Klotz's notes from his one telephone conversation with Dr. Prabhu state that "while [Dr. Prabhu] does not anticipate improvement, [Dr. Prabhu] does feel that [Lyncker] is able to participate in sedentary work with the above-mentioned restrictions." (Doc. 14-1, Lycnker 0089-90). Dr. Prabhu's March 30, 2005 letter states his opinion is (and always has been) just the opposite; specifically, that Broadspire's rendition of his opinion given during the January 29, 2004 Peer Review is inaccurate and that he has always maintained it is not possible for Lyncker to hold gainful employment. (Id. at Lyncker 0330). Not only did Dr. Prabhu deny that he told Dr. Klotz that Lyncker was capable of holding gainful employment, nowhere else does the administrative record suggest that Dr. Prabhu ever held this view.

Beginning on July 7, 2003, Dr. Prabhu, Lyncker's long time treating allergist and immunologist, opined that due to her asthma, plaintiff was severely limited in her functional capacity and thus incapable of sedentary work. (Id. at Lyncker 0077). On March 29, 2004, Dr. Prabhu, via a detailed letter that sets forth his twenty year history of treating Lyncker, explained that due to "severe recalcitrant steroid dependent chronic perennial progressive asthma...it is not possible for Mrs. Lyncker to hold

regular gainful employment at this time." (Id. at Lyncker 0138).  On April 21, 2004, Dr.

Prabhu again noted in his Treating Physician Medical Assessment that Lyncker's

severe steroid dependent asthma would make it difficult for her to hold any job with

consistency.  (Id. at Lyncker 0202).  Finally, in the March 30, 2005 letter, Dr. Prabhu

reiterated his disability assessment.  Thus, Dr. Prabhu's consistent and repeated

pronouncements of Lyncker's inability to hold gainful employment spanning July 7,

2003 through March 30, 2005, are contradicted only by Dr. Klotz's recitation of one

telephone call he had with Dr. Prabhu[4], the substance of which Dr. Prabhu denies.

Dr. Klotz, on the other hand, never saw Lyncker, never treated or evaluated her

and merely relied on his (apparently mistaken) understanding of one conversation he

had with Dr. Prabhu.[5] [6]  While the undersigned is well aware that in Black & Decker

---

[4]   Once realizing that Dr. Prabhu denied telling Dr. Klotz that Lyncker could work,
Broadspire never asked Dr. Klotz or any anyone else to follow up with Dr. Prabhu to
resolve this obviously critical inconsistency.

[5]   The undersigned notes that Dr. Klotz's General Peer Review shows that he
reviewed Lyncker's "progress notes" in conjunction with his conversation with Dr.
Prabhu.  Dr. Klotz, however, fails to state precisely which progress notes he reviewed,
and, other than a reference to some testing measuring oxygen levels in Lyncker's
blood, does not overtly rely on those notes in the "rationale" for his decision.  Instead,
Dr. Klotz's conclusion that Lyncker is no longer totally disabled appears to be derived
almost entirely from his conversation with Dr. Prabhu.

[6]   In its July 11, 2005 final denial letter, the Pension Committee heavily relied on
Dr. Klotz's characterization of his peer to peer conversation with Dr. Prabhu.  (Id. at
Lyncker 0001-0007).  On page 6 of that letter, the following appears in bold type: **"Dr.
Prabhu felt she is able to do sedentary work with these restrictions."**  Thus, the
Pension Committee was obviously swayed by Dr. Klotz's version of the Prabhu
conversation as a seminal reason for denying continued LTD benefits.

Disability Plan v. Nord, 538 U.S. 822, 834 (2003), the Supreme Court explicitly rejected a treating physician rule, nothing in Nord provides support for a plan administrator "arbitrarily refus[ing] to credit a claimant's reliable evidence, including the opinions of a treating physician." Shaw v. Connecticut General Life Ins. Co., 353 F.3d 1276, 1287 (11th Cir. 2003) (quoting Nord, 538 U.S. at 834). Thus, where, as here, a treating physician has consistently and repeatedly espoused a view and supported it with medical findings, the administrator may not reject it based solely on the unsupported and unreliable opinion of a reviewing physician.[7]

The Pension Committee's finding that Dr. Prabhu described in his Medical Assessment that Lyncker had the capability of performing sedentary work is likewise unreasonable. Even the most strained reading of Dr. Prabhu's April 21, 2004 Medical Assessment does not suggest that Lyncker could perform sedentary work. (Id. at Lyncker 0200-0204). It notes that Lyncker is restricted to carrying "less than 5-10 lbs," has "chronic, severe, ongoing asthma," her ability to stand and walk "depends upon

---

[7]     Notably, on October 27, 2004, the SSA adjudicated Lyncker as totally disabled. The ALJ, finding Lyncker credible, determined Lyncker suffered from asthma and affective disorder and that she could not perform the requirements of her past relevant work. (Id. at Lyncker 0264-0272). While the undersigned may consider the SAA award in reviewing the administrator's decision regarding eligibility for benefits under ERISA, see Kirwan v. Marriot Corp., 10 F.3d 784, 790 n. 32 (11th Cir. 1994) (de novo review case), such a determination is not dispositive. See Nord, 538 U.S. at 832 (there are "critical differences between the Social Security disability program and ERISA benefit plans ..."); see also Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co., 230 F.3d 415, 420 (1st Cir. 2000) (while a related Social Security award should not be given controlling weight in an ERISA case, such decisions may be relevant to an eligibility determination).

the severity of exacerbation on a particular day," and that "it will be difficult for her to hold any job with consistency." (Id.).  There is no medical evidence in the record that Lyncker's pulmonary condition improved from that date forward.  In fact, Dr. Prabhu again articulated this same position in his March 30, 2005 letter after periodically treating Lyncker from May 12, 2004 through January 27, 2005.  (Id. at Lyncker 0279-0289, 0330).

Further, of the Broadspire peer reviews performed in January and February 2005, only internist Wendy Weinstein's is relevant to Lyncker's asthma condition.  In reaching the conclusion that Lyncker has no functional impairment that would preclude her from performing any occupation, Dr. Weinstein states that Dr. Prabhu noted on April 7, 2004 that Lyncker was "overall doing well" and that her "severe asthma" was "stable at this time"; however, Dr. Weinstein fails to even mention Dr. Prabhu's April 21, 2004 Treating Physician's Medical Assessment, which describes (as stated before) an individual incapable of performing even sedentary work.  (Id.).  Dr. Weinstein also fails to mention Dr. Prabhu's March 29, 2004 letter that describes the severity of Lyncker's asthma, its significant effect on her daily life and his medical opinion that Lyncker cannot hold regular gainful employment.  (Id. at Lyncker 0137-0138).  While Dr. Weinstein's report shows that she reviewed these documents, which provide an opinion in stark contrast to hers, nowhere does she discuss why these opinions are wrong.  Dr. Weinstein appears to completely ignore them and selectively pick out of

22

context notations from Dr. Prabhu's physician notes.  That kind of selective analysis is unreasonable.

Moreover, after Dr. Prabhu authored the March 30, 2005 letter stating that Dr. Klotz improperly characterized his position and reiterating his position that plaintiff could not hold gainful employment, the administrator did nothing to address this. Broadspire and the Pension Committee never requested that a pulmonologist review Lyncker's medical records and Dr. Prabhu's opinion, never contacted Dr. Prabhu to further discuss Lyncker's asthmatic condition, and, never had one physician examine Lyncker.  While the Court understands that ERISA does not require the administrator to perform a physical examination, with Dr. Prabhu's consistent opinions that Lyncker's asthma rendered her unable to work and Dr. Prabhu's letter stating that Dr. Klotz misconstrued his opinion, a reasonable administrator had to do something more.

The Court further finds Broadspire's Employability Assessment Report of no utility.  Mr. Ciervo simply assumes that Lyncker is capable of sedentary employment and reaches the rather unremarkable conclusion that there are sedentary jobs available for one who can perform sedentary work.  Thus, the report begs the real question.[8]

---

[8]    The Plan definition of "Total Disability" during the Own Occupation period (the first twenty-four months for which LTD benefits are payable following the Elimination Period) and the Any Occupation period (the remainder of the disability period following the Own Occupation Period) also illustrates that Broadspire and the Pension Committee's decision to discontinue benefits at the beginning of the Any Occupation period is unreasonable.  During the Own Occupation period, Lyncker only needed to

23

III.    **CONCLUSION**

The Court does not take lightly that it reviews the administrator's decision here under the most deferential ERISA standard.  However, simply because the arbitrary and capricious standard is the most deferential does not mean it is an impossible standard for the plaintiff to meet.  For the foregoing reasons, plaintiff meets that standard.  Broadspire and the Pension Committee's decision to discontinue Clara Lyncker's LTD benefits as of April 23, 2004 was arbitrary and capricious.  Accordingly, it is hereby **ORDERED**:

---

have the capacity to earn more than 60% of her pre-disability regular monthly earnings in her sedentary job (or a reasonable employment option).  However, during the Any Occupation period, Lyncker qualifies for benefits if she is unable to perform the essential functions of any gainful occupation for which she is qualified or could become qualified (also a sedentary position in this case).  The plain language of the Plan illustrates Lyncker need only break the 60% pre-disability earnings threshold during the Own Occupation period; but, during the Any Occupation period, there is no such reduction in the pre-disability earnings requirement to the 60% threshold.  Because the jobs at issue here under both the Own Occupation and Any Occupation periods are sedentary and Lyncker was required to earn more than 60% of her pre-disability pay during the Own Occupation period (and must make 100% of her pre-disability pay during the Any Occupation period), it was arguably harder for Lyncker to satisfy the definition of "Total Disability" during the "Own Occupation" period than it is during the "Any Occupation" period.  Yet, here, Broadspire and the Pension Committee determined that Lycnker satisfied the definition of "Total Disability" during the duration of the Own Occupation period, but discontinued her LTD benefits toward the beginning of the Any Occupation period, despite there being no cognizable event in April 2004 (or at any time) to justify a change in position in light of the applicable definitions.  This underscores the unreasonableness of the administrator's decision.  Even if this is not the correct reading of the Plan, the fact is the Plan found Lyncker disabled during the Own Occupation period from performing her sedentary job, yet now finds her able during the Any Occupation period to perform a full time sedentary job without any notable improvement in her medical condition.

1.     Plaintiff Clara Lyncker's Motion for Summary Judgment (Doc. 17) is **GRANTED** consistent with this opinion.   Defendant Johnson & Johnson Pension Committee's Motion for Final Judgment Based on Review of Administrative Record (Doc. 12) is **DENIED** consistent with this opinion.   Johnson & Johnson Pension Committee's decision is **REVERSED** and the case is **REMANDED** to the Pension Committee to reinstate Clara Lyncker's long term disability benefits effective April 23, 2004.

2.     Lyncker requests attorneys' fees in her Complaint.   Because of the discretionary nature of such an award under ERISA, see 29 U.S.C. § 1132(g)(1), and because defendant has not had an adequate opportunity to respond to any such motion, the Court will entertain a formal motion for attorneys' fees and costs from plaintiff (if the plaintiff so desires) to be filed no later than **November 14, 2006** with a response thereto from defendant by **November 30, 2006.**

4.     The Clerk will withhold entry of judgment until the Court rules on any attorneys' fee motion.


**DONE AND ORDERED** at Jacksonville, Florida this 23rd day of October, 2006.


TIMOTHY J. CORRIGAN
United States District Judge

25

t
Copies: Counsel of Record